1  Michael R. Totaro  102229
   Totaro & Shanahan
2  P.O. Box 789
   Pacific Palisades,CA  90272
3  (888) 425-2889 (v)
   (310) 496-1260 (f)
4  ocbkatty@aol.com

5  Attorneys for Plaintiff Tibor Mezei

6

7
                   **UNITED STATES BANKRUPTCY COURT**
8
          **CENTRAL DISTRICT OF CALIFORNIA, NORTHERN DIVISION**
9

10  | In re | ) | Case No.: 1:21-bk-10493-MB |

11  **SABRINA ACANTRINEI,**   ) Chapter 7

12       Debtor.   ) Adv. Case No.

13  ――――――――――――――   ) **COMPLAINT FOR:**

14  **TIBOR MEZEI,**   )
                        ) **1. OBJECTION TO DISCHARGE OF**
15         Plaintiff,   )    **SPECIFIC DEBT 11 U.S.C. § 523(a)(4)**
                        ) **2. OBJECTION TO DISCHARGE OF**
16  vs.   )    **SPECIFIC DEBT  11 U.S.C.  523(a)(2)**
                        ) **3. OBJECTION TO DISCHARGE OF**
17  **SABRINA ACANTRINEI,**   )    **SPECIFIC DEBT  11 U.S.C.  523(a)(6)**

18         Defendant.   )

19  ――――――――――――――   )

20

21                       <u>**CONSENT TO FINAL JUDGMENT**</u>

22       Plaintiff Tibor Mezei ("Mezei") consents to entry of a final judgment by the Bankruptcy

23  Court.

24       Plaintiff ("Mezei") alleges as follows:

25                <u>**STATEMENT OF JURISDICTION AND VENUE**</u>

26       This is an adversary proceeding within the meaning of Federal Rules of Bankruptcy

27  Procedure, Rules 7001(4) and (6). This adversary proceeding arises in and relates to the Debtor's

28  Chapter 7 Bankruptcy entitled *In re Sabrina Acatrinei*. which was filed in the Central District of

California, Woodland Hills  Division, Chapter 7 Case No. 1:21-bk-10493-MB on May 11, 2021 (the "Petition Date")

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

Venue is proper in this District pursuant to 28 U.S.C. § 1409, as this adversary proceeding arises under Title 11 or arises under or relates to a case under Title 11 which is pending in this District and does not involve a consumer debt less than $5,000.

This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts) and 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate) and (J) (objections to discharge).

This is an action to determine the dischargeability of certain debts pursuant to 11 U.S.C. § 523(a)(4), (a)(2), and (a)(6). This is also an action to deny Defendant Debtors discharge in the entirety pursuant to 11 U.S.C. §727(a)(4)(A), §727(a)(4)(D), §727(a)(3) and § 727(a)(2)(A).  This is also an action to recover money or property belonging to the estate under 11 U.S.C. § 541.

## THE PARTIES

Plaintiff Tibor Mezei ("Mezei" or "Plaintiff") is an individual residing in the State of California, County of  San Diego, California.

Defendant/Debtor,  Sabrina  Acatrinei  ("Defendant§  17704.09(b)(1)(2)(3).")  is  an individual residing in the County of Ventura, and a resident of the Central District of  California, State of California. Defendant is the Debtor in a chapter 7 bankruptcy case before this Court filed on  May 11, 2021.

Prior to the actions alleged herein, Plaintiff was acquainted with Debtor  through her husband, who was a good friend of his.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

Plaintiff is informed and believes that between February 2018 and November 2018 Plaintiff was employed as the Executive Director of Rebos Detox, a dba of Lost Sheep, LLC, a California Limited Liability Company ("Rebos Detox"). Plaintiff is informed and believes and

1   thereon alleges that Rebos Detox was engaged in the business of providing residential and

2   outpatient alcohol and drug detox and rehabilitation treatment services.

3          Plaintiff is informed and believes and thereon alleges that during the above referenced

4   time, Defendant's duties and responsibilities under her employment with Rebos Detox included

5   but not limited to. overall leadership and day to day management of Detox/Inpatient, Intensive

6   Outpatient and 3 Sober Livings. Her duties included budget development, monitoring and

7   oversight of all programs to ensure they operated in  a fiscally sound manner and maximizing

8   contracts ensuring all fiscal mandates of contracts were met.

9          Plaintiff is informed and believes and thereon alleges that in the course of

10  Defendant's prior employment for Rebos Detox her responsibilities further included ensuring

11  that all program activities  were in full compliance with agency, state, and federal standards,

12  including personnel management, development and leadership and that all programs and systems

13  are in full compliance with all federal, state and county regulations.

14         In or about September 2018, Defendant along with her husband approached Plaintiff

15  and his wife, concerning forming a partnership among themselves to purchase a drug and alcohol

16  rehabilitation and treatment company.

17         Specifically, Plaintiff knew Defendant had experience working in this field and at the

18  time was Executive Director of Rebos Detox, which he later learned was a dba of Lost Sheep.

19  LLC ("Lost Sheep"), a Texas Limited Liability Company which was the business Defendant

20  suggested they purchase.

21         At that time Plaintiff believed Lost Sheep was a separate company from Rebos, LLC

22  such that there were two companies they would be purchasing. Plaintiff later discovered this was

23  a single company, Lost Sheep, which did business as Rebos Detox.

24         At the time of their discussions Plaintiff believed that Lost Sheep owned Rebos, a

25  California Company with both operating out of Los Angeles, California, which is two companies

26  at one location with a six (6) bed detox drug and alcohol rehabilitation facility.

27         At the time, Defendant represented to Plaintiff that the She had been a director at

28  similar drug rehabs for five (5) years and that she had set up the Lost Sheep/Rebos Detox starting

    from scratch and had the expertise to handle all aspects of the business.

Plaintiff is informed and believes and thereon alleges that Defendant approached Plaintiff and his wife about purchasing Lost Sheep/Rebos Detox because she knew Plaintiff is a registered nurse and wanted his knowledge and access to social workers and doctors for referrals.

Plaintiff and Defendant and/or their spouse at least two more in person meetings concerning the business purchase plus additional online or phone meetings before reaching an agreement.

In the course of the various meetings, Defendant represented to Plaintiff and/or his wife, that the owner knows her and has trust in her ability to run the business and she would do a good job running it. Plaintiff was informed and believes that he was led to believe the only reason the owner was selling was to give her the opportunity to purchase the business.

Defendant further represented that the business operated on a referral basis and there was not much needed to keep clients/patients, advising Plaintiff that referring parties were offered $500 as a referral fee for each client/patient that has good insurance, and a marketing person was also paid for each referral.

Plaintiff specifically asked Defendant whether the referral system was legal, and Defendant assured Plaintiff and his wife that it was.

Prior to agreeing to purchase a drug/alcohol detox and rehabilitation and treatment facility with Defendant, Defendant made a number of representations and showed Plaintiff a number of relevant documents to encourage his participations, including but not limited to:

Defendant promised to be transparent with all business transactions so there would never be any questions about where the company was at in any given time;

Defendant showed Plaintiff an Excel sheet with approximately $350,000 worth of accounts receivables for Lost Sheep that they would be taking over and entitled to;

Defendant also provided Plaintiff with an Excel sheet showing Plaintiff about $100,000 in revenue Lost Sheep had been generating in 2018; and

Defendant represented that the license for Lost Sheep was transferable, and we would be able to transfer and obtain payments from insurance companies; and among other matters,

1    Defendant represented Plaintiff would be an equal partner and provided access

2    to all accounts and records;

3    Defendant represented it was legal to pay referral fees to doctors and others.

4    The parties agreed to open a Limited Liability Company under the name of The

5    Giving Tree, LLC.

6    Plaintiff is informed and believes and thereon alleges that Defendant had negotiated

7    terms of the purchase separate and apart from her discussions with Plaintiff and was less than

8    forthcoming about all those negotiations and the actual financial situation of Lost Sheep/Rebos

9    Detox.

10    Sometime in September 2018, Defendant changed the agreement and unilaterally

11    determined the partnership should just include Defendant and Plaintiff. To this extent in Plaintiff

12    and Defendant signed a document Plaintiff referred to their Partnership Agreement ("PA"). A

13    true and correct copy of the Partnership Agreement is attached hereto as Exhibit 1 and

14    incorporated herein by reference.

15    The PA was signed by both Plaintiff and Defendant and aside from Plaintiff's name

16    and address which was written by Plaintiff, the document was filled in by Defendant by hand and

17    in her terms. The PA provided for the name of the company to be formed as "The Giving Tree,

18    LLC" ("TGT").

19    The PA provided the type of business was a Detox/Residential Facility at 4198

20    Sunswept Drive. Studio City, CA 91604 (the "Facility").

21    The PA further provided for each partner to hold a 50% ownership interest naming

22    both Plaintiff and Defendant as co-managing partners.

23    The special terms of the PA also included a 60-day first right of refusal for surviving

24    spouse to buy/sell; a non-competition clause; an expense approval for amounts over $10,000, and

25    a 50/50 split of all liabilities and assets.

26    Although the PA was a handwritten document, at all times, Plaintiff and Defendant or

27    treated this as their partnership agreement.

28

At that time, Plaintiff and Defendant, acting as partners, engaged in discussions, hired counsel and proceeded to obtain information pertaining to the purchase of Lost Sheep/Rebos Detox.

At all times prior to the purchase, Lost Sheep/Rebos Detox was Texas Limited Liability Company owned by Ross Remien ("Remien") and Bradley Grady ("Grady"). As alleged Defendant was the Executive Director and in charge of starting up and operating the business and facility. Lost Sheep/Rebos Detox was authorized to do business in California having registered as a foreign corporation on January 23, 2017.

In furtherance PA, Plaintiff is informed and believes and thereon alleges that on September 27, 2018, Defendant caused to be filed with the Office of the California Secretary of State a LLC Registration, Articles of Organization for "The Giving Tree, LLC" as a domestic LLC No. 201827610069. This registration included the address on Sunswept in Studio City where the Lost Sheep/Rebos Detox facility was located, even though the parties had not yet purchased the business or had any right to use this address. Specifically, the registration provides for an all LLC members management.

While the parties retained counsel to represent them in the purchase of the detox rehab business, Plaintiff is informed and believes and thereon alleges that the owners of Lost Sheep/Rebos Detox provided Plaintiff with false financial information and on information and belief Plaintiff alleges that Defendant knew or should have known of these facts.

Plaintiff is informed and believes and thereon alleges that the Business Sale Agreement ("Sale Agreement") was essentially prepared by Sellers, Brad Grady and Ross Remien, the members of Lost Sheep/Rebos Detox ("Sellers") and their attorneys, with some review by Plaintiff and Defendant's attorneys and that Defendant may have been involved in some of the changes without Plaintiff's knowledge.

Plaintiff is further informed and believes and thereon alleges that prior to signing the Sale Agreement, Defendant led Plaintiff to believe that their attorney and attorney for the Sellers had agreed upon everything including the Management Services Agreement ("MSA") referenced in the Sales Agreement and supposedly attached as an Exhibit as well as the financial.

1      In fact, Plaintiff never actually received a copy of the MSA and full financial as

2   represented and Plaintiff is informed and believes and thereon alleges that Defendant was aware

3   of these misrepresentations but failed to advise Plaintiff of this.

4      Although Plaintiff was promised full disclosure of financials etc. for the business, he

5   never received actual copies of the relevant financials and disclosures as promised, all of which

6   he is informed and believes Defendant as Executive Director of Lost Sheep/Rebos Detox, prior

7   to the purchase had access to and knowingly withheld from Plaintiff.

8      Although Plaintiff initially believed they were purchasing the business and changing

9   the name to TGT, the Sale Agreement while stating it was to purchase the business from Sellers,

10  Plaintiff was not aware Sellers did not consider this a purchase of the business, only an asset

11  purchase.

12     On October 31, 2018, all parties, Buyers (Defendant and Plaintiff), and Sellers

13  (Remien and Grady) executed the Sales Agreement. A true and correct copy of the Sales

14  Agreement is attached hereto as Exhibit 2 and incorporated herein by reference without the

15  actual Exhibits which were never provided as required.

16     Plaintiff is informed and believes and thereon alleges that although the exhibits to the

17  extent they actually exist were not presented to Plaintiff, Defendant had the same available to her

18  in her capacity as Executive Director of Rebos Detox, yet Defendant failed to provide Plaintiff

19  with access to these relevant documents.

20     The Sale Agreement provided for a total purchase price of $350,000, which included

21  all assets and most importantly and substantial factor in the purchase by Plaintiff the existing

22  accounts receivables by Lost Sheep/Rebos Detox, represented by Sellers and Defendant to be

23  approximately $350,000 which could be received over a lengthy period. For tax purposes the

24  purchase price was allocated as $175,000 or 50% to each of the Buyers, i.e., Plaintiff and

25  Defendant.

26     The Sales Agreement provided for a two-part closing with the first part requiring a

27  payment by Buyers in the amount of $200,000 and the Buyers to make monthly payments of

28  $12,500.00 beginning December 1, 2018, and continuing until paid no later than December 31,

2019 (the "Final Closing").

1    Although no MSA was ever provide to Plaintiff the Sale Agreement provided that in

2    the period between the Interim Closing and Final Closing, TGT as Buyers would independently

3    operate the business as managers using the licenses, permits and accreditation of Lost Sheep,

4    LLC. Buyers would collect all income from the Studio City Facility including all accounts

5    receivables collected following the execution of the Sales Agreement.

6    The Sale Agreement provided the Sellers had the necessary licenses and permits to

7    operate the business at the Studio City Facility as a Drug and Alcohol Rehabilitation SUD

8    facility and shall continue to operate as such under it licenses and its National Provider Identifier

9    Number ("NPIN") until at least the Final Closing Date.

10    The Sale Agreement also provided that Defendant would be listed as a managing

11    member of Lost Sheep, LLC with the legal power as well as access to the Lost Sheep Bank

12    Account until the Buyers bank account is credentialed with insurance companies for electronic

13    funds transfer.

14    Also pursuant to the Sale Agreement Plaintiff was advised that as Buyers they were

15    relying on the licensure and accreditation of Sellers until at least the Final Closing Date.

16    Based on the Sale Agreement, Defendant was added as a managing member of Lost

17    Sheep/Rebos Detox and given access to its bank account.

18    Plaintiff was informed and believes and thereon alleges that prior to the purchase and

19    as a substantial factor in his agreeing to invest as a 50% member and equal partner with

20    Defendant as Buyers, Defendant had represented Plaintiff would have access and full

21    transparency to all aspects of the business, including accounts, etc.

22    In consideration of the above and all representations made by Defendant to Plaintiff

23    concerning the business and her knowledge and experience, Plaintiff paid a total of $150,000

24    toward the purchase which included an initial payment plus funds for initial expenses.

25    Subsequent to the Initial Closing Date and payment of funds to Sellers, Defendant

26    took over the handling of TGT and its operation of the Studio City Facility previous run under

27    Rebos Detox.

28    Defendant initially provided Plaintiff with some updates as to the business including

new clients and payment situations and including representing that the licenses were transferable

1  to the extent of introducing Plaintiff to a lawyer, who Defendant falsely claimed was an expert in

2  transferring licenses.

3      Based in the representations of Defendant, Plaintiff paid the license expert attorney

4  Keith Fowler, a retainer from his own funds, only to discover he was not a lawyer and unable to

5  assist in the required transfer and Plaintiff in fact learned the licenses were not transferrable as

6  represented by Defendant and Sellers.

7      Plaintiff is informed and believes and thereon alleges that TGT had to apply for new

8  licenses and NIPN in its own name contrary to the representations of Sellers and Defendant,

9  which Plaintiff is informed and believes was a factor in the financial situation with TGT.

10      About two weeks after the Initial Closing Date, Plaintiff and his wife,  both registered

11  nurses, were talking to individuals they knew pertaining to patient referrals as Defendant had

12  represented was the business model. While Plaintiff was told by these health care workers they

13  could make referrals, these individuals advised they would not take anything, even food, so it

14  could not even appear they were being bribed.

15      Following this Plaintiff spoke to Defendant, and Defendant told him the laws had

16  recently changed, so  it was more difficult to pay for services like referral fees and they had to be

17  more cautious. Plaintiff  did inquire when things changed but Defendant never responded as to

18  when.

19      Plaintiff later discovered that on October 24, 2018, just a week before they signed the

20  Sale Agreement, the United States Congress passed a law called "Eliminating Kickbacks in

21  Recovery Act ("EKRA"). Plaintiff also discovered that in September 2018, at the time they were

22  discussing the purchase and Defendant was representing the business model as being easy as it

23  included paying for referrals which she represented was legal, the California Legislature passed

24  SB1228, which was similar to EKRA but specifically applicable to California.

25      At no point prior to entering into the Sale Agreement did Defendant ever advise the

26  business model she was proposing was no longer a legitimate model and in fact illegal, even

27  when Plaintiff specifically inquired as to its legality.

28      In about March 2019, Plaintiff began to be more concerned and suspicious as he had

no access to the records and accounts. Plaintiff was supposed to set up the business for tax

1  reporting purposes and went to a tax presentation for this purpose which Defendant failed to

2  show up for.

3      Plaintiff then discovered that Defendant and the Sellers had filed tax returns for 2018

4  for Lost Sheep, LLC with all four of the parties, the two sellers and to buyers, listed as members

5  since the initial closing only provide for TGT's purchase of 50% of the business.

6      Around that time, Plaintiff discovered that in the 2018 taxes Defendant reported,

7  erroneously and fraudulently, that Plaintiff received $28,000 in W2 wages from Lost Sheep to

8  the IRS and Texas Tax Board. Plaintiff  never received any wages or payments of any kind from

9  Lost Sheep, TGT, Defendant or any party related to the business.

10     Around that same time, Plaintiff received false excel sheets with company financials

11  when trying to file taxes for TGT. Plaintiff was informed by a reliable source that Defendant and

12  Sellers had underreported employee taxes to the California Franchise Tax Board by a substantial

13  amount such that employees were likely being paid under the table to make up their salaries.

14     Plaintiff is informed and believes and thereon alleges that Defendant also filed TGT's

15  taxes by falsely signing his name on the IRS return.

16     Plaintiff is informed and believe and thereon alleges that in about March 2019,

17  Defendant was beginning efforts to attempt to sell TGT without Plaintiff's knowledge.

18     Plaintiff is informed and believes and thereon alleges that Defendant had changed

19  everything to make it appear she was the sole owner/manager of TGT, including giving herself

20  the title CEO, and providing Plaintiff with virtually no information as to the business.

21     Plaintiff is informed and believes and therein alleges that in attempting to sell TGT,

22  Defendant misled the prospective buyer, F2 Management, LLC ("F2"), that she was the sole

23  owner, and it was not until F2 drafted the LLC Interest Purchase Agreement, that she had to

24  advise the buyer to make changes to include Plaintiff as her partner.

25     Plaintiff specifically inquired of Defendant as to whether the sale included the

26  Accounts Receivables of TGT and the balances they had purchased as part of the Sale

27  Agreement. In response, Defendant emailed Plaintiff advising there were $600,000 in accounts

28  receivables and she would be sharing these with Plaintiff.

1        On July 29, 2019, Plaintiff and Defendant executed the LLC Interest Purchase

2   Agreement ("Purchase Agreement") drafted by F2 which listed Defendant and Plaintiff as Sellers

3   and provided for a sale of 100% of the issued and outstanding LLC interests in TGT for a total

4   purchase price of $150,000, with an initial payment of $80,000 on July 29, 2019, and seven (7)

5   monthly payments of $10,000 beginning September 1, 2019.

6        The Purchase Agreement expressly provided that Sellers, Plaintiff and Defendant

7   were retaining ownership of the aging report accounts receivables billed prior to July 29, 2019. A

8   true and correct copy of the Purchase Agreement is attached hereto as Exhibit 3 and incorporated

9   herein by reference.

10        To date, it is clear to Plaintiff that he relied on numerous misrepresentations of

11   material facts and numerous breaches of Defendant's fiduciary duties as a managing member of

12   their TGT to his substantial detriment as he has never received any payment from TGT, Lost

13   Sheep/Rebos Detox for promised accounts receivables that provide the basis for entering into the

14   agreements referenced herein as Exhibits 1 to 3.

15        In addition, Defendant has failed to provide Plaintiff with any regular accounting or

16   statements, profit and loss statements, lists of outstanding receivables, etc. for either Lost

17   Sheep/Rebos Detox or TGT since their initial formation of TGT to the present.

18        Plaintiff is informed and believes and thereon alleges that directly contrary to the

19   terms of the Partnership Agreement, Exhibit 1, and her fiduciary duties to Plaintiff as manager, at

20   various times between November 1, 2018, and July 29, 2019, Defendant took out loans for TGT

21   in amounts in excess of $10,000.00 which included business lines of credit that provided for

22   daily or weekly withdrawals from the TGT business accounts and caused a substantial detriment

23   to the business.

24        Plaintiff is informed and believes and thereon alleges that in the course of operating

25   and managing TGT, Defendant has misused  and appropriated various funds of TGT for her

26   personal use.

27        Plaintiff is informed and believes and thereon alleges that in the course of operating

28   and managing TGT, Defendant has made payments to individuals or companies for illegal

1  referral fees, which may have been listed as marketing or other expenses, when no marketing

2  persons were hired.

3      Plaintiff is informed and believes and thereon alleges that Defendant used funds of

4  TGT to pay for Philadelphia insurance for Director and Executives insurance and failed to report

5  Plaintiff as an owner, which prevented Plaintiff from filing a claim and possibly receiving

6  insurance funds.

7      Plaintiff is informed and believes and thereon alleges that Defendant conspired with

8  others to remove Plaintiff from all companies, which, blocked Plaintiff from access to records

9  necessary to even file taxes under these companies.

10                        **FIRST CLAIM FOR RELIEF**

11                **[Objection to Discharge Of Specific Debt Pursuant to**

12                **11 U.S.C. § 523(a)(4) – Fraud as a Fiduciary]**

13      Plaintiff hereby incorporates the preceding paragraphs as though set forth in full and

14  in their entirety herein.

15      At all relevant times, Plaintiff and Defendant were partners and/or supposed to be

16  equal managers in The Giving Tree, LLC ("TGT") and to the extend the Sale Agreement

17  provided Defendant access to accounts and information related to their purchase of assets of Lost

18  Sheep/Rebos Detox, Defendant owed a fiduciary duty to Plaintiff including, among other things,

19  the duties of care, loyalty and good faith. California Corporations Code ("Corp.Code")

20  §11701.09 (a).

21      Defendant's fiduciary duties to Plaintiff include the duty (1) to account to TGT and

22  Plaintiff member and hold as trustee for TGT and its members, in particular Plaintiff, any

23  property, profit, or benefit derived by TGT and Defendant in the conduct of winding up of the

24  activities of TGT, including the appropriation of a TGT opportunity, and to refrain from dealing

25  with TGT as or on behalf of a person having an adverse interest to TGT; and to refrain from

26  competing with TGT. Corp. Code  § 17704.09(b)(1)(2)(3).

27      Defendant's fiduciary duties to Plaintiff also required Defendant to refrain from

28  engaging in (1) grossly negligent or reckless conduct, (2) intentional misconduct, and (3) any

1    knowing violation of the law in its activities with the LLC. Corp. Code § 17704.09(c).

2        As alleged herein, throughout Defendant's management of TGT and aspects of Lost

3    Sheep/Rebos Detox where Defendant was authorized by the Sale Agreement to act for the

4    benefit of TGT and its members, Defendant breached the fiduciary duties alleged herein in

5    failing to properly account to Plaintiff as to the profit, property or benefits derived by TGT

6    and/or Defendant for the benefit of TGT, both in the ongoing operation of the business of and

7    specifically in the winding up of the activities of TGT, including the appropriation of funds

8    pertaining to ongoing accounts receivables, and misappropriation of funds of TGT for

9    Defendant's sole benefit.

10        In addition, prior to entering into the Sale Agreement, Defendant, made material and

11   false representations to Plaintiff designed to induce Plaintiff become a member of TGT and

12   engage in business with Defendant based on her experience and knowledge of the business, as

13   alleged herein, which Plaintiff later discovered were false after entering into the Sale Agreement,

14   Exhibit 2, such as the Seller was not able to transfer its licenses or leases as represented by

15   Sellers and Defendant; that Defendant would be completely transparent in operating the business

16   of TGT, and that TGT would obtain clients/patients through referrals by paying referral fees

17   which were legal, when in fact, state and federal laws had recently been enacted to specifically

18   prohibit such actions.

19        As managing member in TGT, Defendant stood in the position of a trustee of the

20   assets of TGT and its members, including Plaintiff.

21        However, a set forth above, Defendant breached this fiduciary duty and engaged in

22   numerous acts of fraud, self-dealing, misappropriation, embezzlement, preparation of false

23   financial records, and tax fraud while acting in her capacity as managing member.  As a result of

24   this misconduct as alleged herein, Defendant's debt to Plaintiff arises from "fraud or defalcation

25   while acting in a fiduciary capacity," within the meaning of 11 U.S.C. Section 523(a)(4) and

26   therefore should be excepted from discharge.

27   ///

28   ///

## SECOND CLAIM FOR RELIEF

**[Objection to Discharge Of Specific Debt Pursuant to**

**11 U.S.C. § 523(a)(2) – Actual Fraud]**

Plaintiff hereby incorporates the preceding paragraphs as though set forth in full and in their entirety herein.

The numerous representations made by Defendant as alleged herein were indeed false, and the Defendant knew them to be false at the time she made them. Defendant made such representations to induce Plaintiff to invest his funds in TGT and allow her to operate the business without regard to his interests and to intentionally deprive Plaintiff of his rights and interests as a member of TGT, including proper accounting and a share in the profits, most specifically the substantial amount of accounts receivables from both Lost Sheep/Rebos Detox acquired by TGT in the Sales Agreement and the substantial Accounts Receivables retained by TGT after the Purchase Agreement with F2 whereby TGT retained such accounts prior to July 29, 2019.

At the time Plaintiff tendered his investment contributions of $150,000.00 to TGT, Defendant represented that Plaintiff was her partner/co-manager with a 50% interest in the TGT and that such funds would be used to further TGT's interests.

Plaintiff also made payment of an additional funds toward attorney's fees for transfer of licensing which did not occur.

Plaintiff was further damaged by Defendant's fraudulent filing of a W2 in Plaintiff's name in the amount of $28,000 to the IRS and State of Texas for 2018 income when Plaintiff never received any money from TGT in 2018 or otherwise.

Plaintiff made all payments/investments in reliance on Defendant's representations that she would honor the terms of their Partnership Agreement and her manager responsibility for TGT Limited Liability Company and that the acquisition of the assets of the Lost Sheep/Rebos Detox was for the benefit of the Partnership and TGT.

During the course of management of TGT, Defendant fraudulently represented and actively concealed the true income of TGT. Defendant prepared materially false financial

1    statements and filed fraudulent tax returns.

2        Defendant made further representations that all expenses paid by Defendant were

3    necessary and for the benefit of TGT when in fact, Defendant misused funds for her personal

4    expenses to the detriment of TGT and Plaintiff.

5        Defendant made false representations to Plaintiff that they would be equal members

6    and when Defendant's true intentions were likely to and did mislead Plaintiff to believe that he

7    was an equal owner in TGT and would receive his equal share of the net income, and in

8    particular the accounts receivables.  The failure to disclose Defendant's true intentions as herein

9    alleged was done with the intent to deceive Plaintiff and to induce Plaintiff to act thereon.

10        At the time the misrepresentations occurred, Plaintiff was ignorant of the true facts.

11   Had Plaintiff been aware of the true facts, Plaintiff would not have invested or loaned  monies

12   for TGT or agreed to be a partner with Defendant.

13        Plaintiff's reliance on Defendant's representations was justified as the facts did not

14   render it apparent that Defendant was attempting to, as she did, defraud Plaintiff.

15        The aforementioned conduct of Defendant included misrepresentations, deceit, or

16   concealment of material facts known to the Defendant with the intention on the part of

17   Defendant of thereby depriving Plaintiff of property and or legal rights, or otherwise causing

18   injury.

19        Based on the foregoing, Defendant's debts to Plaintiff are nondischargeable as actual

20   fraud based on 11 U.S.C. § 523(a)(2)(A).

21                      **THIRD CLAIM FOR RELIEF**

22              **[Objection to Discharge Of Specific Debt Pursuant to**

23              **11 .S.C. § 523(a)(6) – Willful and Malicious Injury]**

24        Plaintiff hereby incorporates the preceding paragraphs as though set forth in full and

25   in their entirety herein.

26        The foregoing false statements, preparation of false financial statements, and

27   embezzlement, were intentional acts on the part of Defendant made with the specific intent of

28   causing injury to Plaintiff.

1  Further, Defendant's false statements on W2 forms and tax returns that Plaintiff had

2  income of $28,000 from Lost Sheep/Rebos Detox in 2018 were made with the specific intent of

3  causing harm to Plaintiff's business, trade, profession and/or occupation.

4  As a result of Defendant's conduct alleged in the First through Third Causes of

5  Action, Plaintiff suffered both financial damages and damage to his professional reputation

6  according to proof at the time of trial.

7  Pursuant to 11 U.S.C. §523(a)(6), debt caused by a debtor's willful and malicious

8  conduct which results in damages shall be nondischargeable.

9  As a result of Defendant's willful and malicious conduct, Defendant's debt to

10

11  Plaintiff is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

12  The aforementioned conduct of Defendant was a misrepresentation deceit, or

13  concealment of material facts known to the Defendant with the intention on the part of

14  Defendant of thereby depriving Plaintiff of property and or legal rights, or otherwise causing

15  injury. Therefore, Plaintiff is also entitled to punitive damages against Defendant in an amount

16  according to proof.

17  **WHEREFORE**, the Plaintiff prays that this Court make and enter Judgment as follows:

18  <u>**FOR THE FIRST THROUGH CLAIMS FOR RELIEF**</u>

19  1. To deny the Defendant/Debtor's discharge with respect to Plaintiff Tibor Mezei's

20  specific debt.

21  2. For costs of suit incurred, including attorneys' fees as provided by applicable case

22  law, statute and/or agreement of the parties.

23  3. For such other relief as the Court deems just and proper.

24  Dated: November 7, 2021                    Totaro & Shanahan

25

26                    /s/ Michael R. Totaro
       Michael R. Totaro

27       Attorneys for Plaintiff Tibor Mezei

28

# Exhibit 1

# We The People

## PARTNERSHIP AGREEMENT WORKBOOK

* Please read the instructions carefully and answer each question according to the instructions.
* If a question is optional and/or does not apply to your situation, you must write "NA" or draw a line above the answer blank.
* Please print legibly in black or blue ink. Only your written answers will be typed into the documents.
* Answers that go beyond the scope of the workbook will not be typed and may cause delays.
* Changes requested after your documents have been typed and prepared may result in additional charges.

**Name of First Partner** Sabrina Weathemen Aratteiner

**Address of First Partner** 2375 Duson St

City Simi Valley      State CA    Zip 93065

**Name of Second Partner** Tibor Mezei

**Address of Second Partner** 316 N Maryland Ave # 307

City Glendale      State CA    Zip 91206

**Name of Partnership** The Giving Tree LLC

**Type of Business** Detox / Residential Facility

**Address of Partnership** 4198 Sunswept Drive

City Studio City      State CA    Zip 91604

**% Ownership of First Partner** 50%

**% Ownership of Second Partner** 50%

**Managing Partner** Sabrina Aratteiner (indicate if Co-Managing Partners)
Tibor Mezei

STORE: _____      Page 1 of 2      CUSTOMER: _____
I have reviewed this page for clarity and legibility with the customer

The above answers were provided by me and I did not receive any legal advice from store personnel in completing my forms

PROPRIETARY: This document and information contained herein may not be reproduced, reused or disclosed without the express written permission of

Exhibit B Express

# Exhibit 2

## BUSINESS SALE AGREEMENT

This Business Sale Agreement (this "Agreement") is made and entered into on November 1, 2018, by and between **Brad Grady** and **Ross Remien** ("Sellers"), on the one hand, and **Sabrina Acatrinei** and **Tibor Mezei**, ("Buyers"), on the other hand. Sellers and Buyers are collectively referred to herein as the "Parties", and are sometimes referred to individually as a "Party".

### RECITALS

**WHEREAS,** Sellers are the sole and absolute owners of a business known as **Lost Sheep, LLC**, a Texas Limited Liability Company, d/b/a Rebos Detox (the "Business");

**WHEREAS,** Sellers desire to sell the Business to Buyers, and Buyers desire to purchase the Business from Seller.

**NOW, THEREFORE,** for and in consideration of the mutual covenants and benefits derived and to be derived from this Agreement by each Party, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers and Buyers hereby agree as follows:

I.  **AGREEMENT TO PURCHASE/SELL**

Subject to and in accordance with the terms and conditions of this Agreement, Buyers agree to purchase the Business from Sellers, and Sellers agree to sell the Business to Buyers. Sellers represent and warrant to Buyers that it has (and Buyers will have) good and marketable title to the Business, free and clear of all liens and encumbrances.

The Business includes the following: All interests, without any exclusions, owned by Sellers in the Business, a state licensed drug and alcohol rehabilitation center located at 4198 Sunswept Drive, Studio City, California 91604 ("Studio City Facility"), all the Business's trade, goodwill, and all other tangible and intangible assets of the Business.

II.  **DEAL STRUCTURE**

A.  **Time and Place of Closing(s)**

Initial Closing is the date and time at which parties agree to finalize the initial portion of the transaction. The Initial Closing date is designated as November 1, 2018 ("Initial Closing Date"), provided there are no unforeseen delays. Final Closing is the date and time at which the parties completely finalize this transaction ("Final Closing Date"). Time is of the essence and in no event shall closing be later than 15 calendar days after

BG initials
RR initials

SA initials
TM initials

1

EXHIBIT 2
20

designated closing date(s), unless an extension is agreed upon in writing between the Buyers and the Sellers.

**B.    Two Part Transaction**

The sale transaction shall be completed in two parts.  First, upon the Initial Closing Date, Buyers shall obtain 50% ownership of the Business, with Sabrina Acatrinei being named as the sole Managing Member of Lost Sheep LLC.  The Business shall then continue to operate at the Studio City Facility using the licenses, permits and accreditation of Lost Sheep LLC until Buyers and Buyers' company The Giving Tree, LLC, a California Limited Liability Company ("The Giving Tree") secure licensure and accreditation to operate the Studio City Facility on their own.  After the Buyers, with Sellers' cooperation, obtain licenses and permits to operate as a Drug and Alcohol Rehabilitation (Substance Use Disorder, or "SUD") facility through the California Department of Health Care Services ("DHCS-CA"), the Final Closing shall take place and the remaining 50% of the Business shall transfer to Buyers, with Sellers resigning from the Business.

**C.    Concurrent Execution of Management Services Agreement**

During the interim period between the Initial Closing Date and the Final Closing Date, Buyers and Buyers' company, The Giving Tree, shall independently operate the Business as managers using the licenses, permits and accreditation of Lost Sheep LLC. Specifically, in conjunction with the execution of this Agreement, Sellers and Buyers shall each execute on behalf of their respective companies – Lost Sheep LLC and The Giving Tree LLC – the Management Services Agreement attached and incorporated hereto as Exhibit B ("MSA").  The Parties acknowledge that the MSA is an essential and necessary part of this Agreement and agree to be fully bound by it.

**III.    PURCHASE PRICE AND METHOD OF PAYMENT**

Buyers shall pay and Sellers shall accept the purchase price for the Business as follows:

**A.    Consideration**

As total consideration for the purchase and sale of the Business and Buyers' assumption of the assumed obligations and all other liabilities provided for in this Agreement, the Buyers shall pay to the Sellers the sum of $350,000.00, and such total consideration to be referred to in this Agreement as the "Purchase Price."

BG initials
RR initials

SA initials
TM initials

2

EXHIBIT 2
21

**B.**   Payments; Cure Period; Penalties

(a) The sum of $200,000.00 shall be delivered to Sellers by Buyers at Initial Closing ("Initial Closing Amount");

(b) Buyers shall then jointly and severally make final payment of $150,000.00 (Final Closing Amount) via installment payments of **at least $12,500 per month** ("Minimum Payment") on or before the 1st day of each month, beginning December 1, 2018, and continuing until paid in full, ending no later than December 31, 2019; and

(c) If Buyers fail to make any Minimum Payment, Buyers shall have a cure period of seven calendar days following the missed due date without incurring any penalty (the "Cure Period"). If the applicable Minimum Payment has not been made during the Cure Period, a penalty equal 10% of the Minimum Payment shall accrue on the 1st of each calendar month following the Cure Period until the applicable Minimum Payment is made, including accrued penalties. If a Minimum Payment becomes more than 690 days overdue, Sellers shall have the right to, by written notice to Buyers, declare that the entire amount of the Final Closing Amount then outstanding plus accrued and unpaid penalties to the date of acceleration ("Acceleration Payment"), shall become immediately due and payable. If an Acceleration Payment is triggered, Buyers' failure to make such payment will cancel any additional right of ownership of Buyers and cause the Business, including all licenses and permits to revert to Sellers, without any right to reimbursement for any sum previously paid by Buyers.

**C.**   **Allocation for Tax Purposes**

The Purchase Price shall be allocated for tax purposes as follows:

| Buyer | Asset Purchased | Fair Market Value |
|-------|-----------------|-------------------|
| Sabrina Acatrinei | 50% | $175,000 |
| Tibor Mezei | 50% | $175,000 |

The parties agree to co-operate in the filing of elections under the *Internal Revenue Code* and under any other applicable taxation legislation, in order to give the effect of the above specified allocation of the Purchase Price.

BG Initials 
RR Initials

SA Initials
TM Initials

3

EXHIBIT 2
22

**D.    Fair Market Value**

Buyers and Sellers each acknowledge that the amount of Purchase Price allocated to the Business properties represents the fair market value of the properties. Buyers and Sellers each agree to report the sale of the business for income tax purposes according to the allocations set forth herein.

**IV.    CLOSING**

**A.    Representations and Warranties of Seller**

Sellers make the following representation and warranties as of the date hereof and as of the date of Initial Closing, except when otherwise indicated.

**1.    Organization and Standing**

The Business is duly organized, validly existing, in good standing under the laws of the State of Texas and is qualified to carry on its business in the State of Texas and the State of California, and has the corporate power and authority to carry on its business as it is now being conducted.

**2.    Authority Relative to this Agreement**

Sellers are the sole and absolute owners of the Business, free and clear of any liens, charges, encumbrances or rights of others, and are exclusively entitled to sell the Business. Sellers have full power and authority to execute this Agreement and carry out the transactions contemplated by it. No further action is necessary by the Sellers to make this Agreement valid and binding upon Sellers and enforceable against them in accordance with the terms hereof, or to carry out the actions contemplated hereby. The execution, delivery, and performance of this Agreement by the Sellers will not constitute:

(a) a breach or a violation of the Business's Operating Agreement, by-laws, or of any law, agreement, contract, obligation, indenture, deed of trust, mortgage, loan agreement or other instrument or commitment to which the Business is a party, or by which it is bound;

(b) a violation of any order, judgment or decree to which the Business is a party or by which its assets or properties is bound or affected;

BG Initials _____    SA Initials _____
RR Initials _____    TM Initials _____

4

EXHIBIT 2
23

(c) a violation of any federal, state or local law, statute, rule, or regulation applicable to the Business; or

(d) result in the creation of any lien, charge or encumbrance upon the Business's assets or properties except as stated herein.

### 3.    Compliance with Applicable Laws

The Business is operating in accordance with all applicable laws, rules, and regulations. In compliance with such laws, the Sellers have duly licensed, registered, or qualified the Business with all appropriate authorities and agencies, including but not limited to the California Secretary of State, the California Department of Business Oversight, and the California Department of Health Care Services. None of the Sellers' actions in selling the Business to Buyers and transferring good and merchantable title to those assets and properties set out in herein are prohibited by or have violated or will violate any laws, rules or regulations in effect on the date of this Agreement or on the date of any closing(s).

### 4.    Authorization and Enforceability

This Agreement constitutes Sellers' legal, valid and binding obligation, enforceable in accordance with its terms, subject, however, to the effects of bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and conveyance and other laws for the protection of creditors, as well as to general principles of equity, regardless whether such enforceability is considered in a proceeding in equity.

### 5.    Licenses, Permits and Accreditation

The Sellers have secured the necessary licenses and permits to operate the Business at the Studio City Facility as a Drug and Alcohol Rehabilitation SUD facility through the California Department of Health Care Services.  The Business is operating and shall continue to operate at the Studio City Facility until at least the Final Closing Date under California License Number 190984AP and National Provider Identifier Number 1568981041. Furthermore, the Business is operating and shall continue to operate at the Studio City Facility until at least the Final Closing Date with accreditation from the Joint Commission.

### 6.    Tax Matters

The Sellers have timely prepared and filed all federal, state, and local tax returns and reports as are and have been required to be filed, and all taxes shown thereon to be due

BG initials ___    SA initials ___
RR initials ___    TM initials ___

5

EXHIBIT 2
24

have been paid in full, including but not limited to sales tax, withholding tax, and all other taxes of every nature.

**7.      Properties**

The Sellers have good and merchantable title to all of its properties and assets that constitute "Business" as defined herein. At Initial Closing, such properties and assets will be subject to no mortgage, pledge, lien, conditional sales agreement, security agreement, encumbrance or charge, secured or unsecured.

**8.      Litigation**

There is no action, suit, proceeding, claim or investigation by any person, entity, or governmental entity pending or, to Sellers' knowledge, threatened against it before any governmental entity. Seller has been threatened with litigation by Landlord Kaveh Elihu regarding rents for an unrelated property. Seller's will be responsible for handling all aspects of dealings with Landlord Kaveh Elihu and agrees to indemnify and hold Buyer harmless in this regard as set forth more fully herein under section IV, B.5(a) entitled indemnification.

**9.      Documents for Review**

The Sellers' Documents for Review enumerated in Exhibit "A" attached hereto and made a part hereof are true, authentic, and correct copies of the originals, or as appropriate the originals themselves, and no alterations and modifications thereof have been made.

**10.     Business Lease**

The lease currently operative on the Studio City Facility, is in good standing and all payments required to be made under the lease have been made by Sellers. All rent averages, rent, maintenance and other expenses relating to the lease including any real property tax obligations and insurance obligations up to occupancy by Buyers are the responsibility of Sellers.

**11.     No Undisclosed Liabilities**

The Business has no liabilities or obligations of any nature (whether known or unknown and whether absolute, accrued, contingent, or otherwise) except for those disclosed herein and liabilities or obligations reflected or reserved against in the Accounts Payable spreadsheet provided by Sellers. Sellers expressly represent that, prior to the Initial Closing Date, Sellers shall have (i) paid off all outstanding charges incurred prior to

BG initials _____                                                     SA initials _____
RR initials _____                                                     TM initials _____

6

EXHIBIT 2
25

November 1, 2018 on the Business's American Express card; and (ii) paid all payroll for
any work or services completed before November 1, 2018.

BG initials 
RR initials

SA Initials 
TM Initials

7

EXHIBIT 2
26

### 12. No Bankruptcy

No attachments, execution proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings are pending or, to Sellers' knowledge, threatened against Sellers or the Business, nor are any such proceedings contemplated by Sellers or the Business. Neither Sellers nor the Business have made a general assignment for the benefit of creditors, filed any voluntary petition in bankruptcy or admitted in writing their inability to pay their debts as they come due, and Sellers have received no written notice of and have no knowledge of the filing of any involuntary petition in bankruptcy by Sellers' creditors or the Business's creditors or the appointment of a receiver to take possession of all or substantially all of Sellers' assets or the Business's assets.

### 13. No Other Representations or Warranties; Disclosed Materials

Sellers make no other express or implied representations of warranty with respect to Sellers, and Sellers disclaims any other representations or warranties not contained in this Agreement, whether made by Sellers, any affiliate of Sellers, or any of their respective officers, directors, managers, partners, employees or agents.

### 14. Accuracy of Representation and Warranties at Initial Closing; Reliance

Sellers warrant to the Buyers that each of the representations and warranties made by Sellers are accurate and not misleading at the Initial Closing. Sellers acknowledge that Buyers are entering into this Agreement in reliance of each representation and warranty.

### 15. Survival of Representations and Warranties

Sellers covenant and agree that their representations and warranties shall survive any Closing Date(s) of this Agreement.

**B.    Representations and Warranties by both Buyers and Sellers**

Buyers and Sellers make the following representations and warranties as of Initial Closing and as of the date hereof:

### 1.    Fees

Buyers and Sellers hereby represent and warrant that there has been no act or omission by Buyers or Sellers which would give rise to any valid claim against any of the parties

BG initials
RR initials

SA initials
TM initials

8

EXHIBIT 2
27

hereto for a brokerage commission, finder's fee, or other like payment in connection with the transactions contemplated hereby.

**2.    Financial Resources**

Buyers shall have as of Initial Closing, sufficient funds with which to pay the Initial Closing Amount and consummate the transaction and, following Initial Closing, Buyers will maintain sufficient funds from operating the Business to pay any Minimum Payment due before Final Closing pursuant to this Agreement and meet its other payment obligations under this Agreement.

**3.    Payment of Costs and Expenses**

Except as expressly provided to the contrary in this Agreement, each party shall pay all of its own costs and expenses incurred with respect to the negotiation, execution and delivery of this Agreement and the exhibits hereto.

**4.    Litigation**

There is no action, suit, proceeding, claim or investigation by any person, entity, or governmental entity pending or, to Buyers' knowledge, threatened against it before any governmental entity that impedes or is likely to impede its ability to consummate the transaction.

**5.    Indemnification**

(a) Sellers shall indemnify and hold Buyers harmless from any and all liabilities and obligations arising from the operation of the Business prior to the Initial Closing. This obligation shall include reasonable attorney fees and costs as a result of any action being brought by, for or against Buyers relating to this Agreement.

(b) Buyers shall indemnify and hold Sellers harmless from any and all liabilities and obligations arising from Buyers' operation of the Business after the Initial Closing and after Final Closing. This obligation shall include reasonable attorney fees and costs as a result of any action being brought by, for or against Sellers relating to this Agreement.

**6.    Default**

After execution of this Agreement by the parties, if either party fails to perform its respective obligations, or breaches a warranty or covenant, that would constitute a default. The defaulting party shall cure the default within 30 days of notice in writing by the other party. In the event of a failure to cure such default by either party within the

BG initials ___    SA initials ___
RR initials ___    TM initials ___

9

EXHIBIT 2
28

stipulated time, Sellers or Buyers shall have the right to cancel this transaction and/or sue for damages in addition to any other relief provided under this Agreement. In a suit for default, the prevailing party shall recover reasonable attorney fees and costs.

7.    **Survival of Representations and Warranties**

Each of the parties to this Agreement covenants and agrees that their respective representations, warranties, covenants, statements, and agreements contained in this Agreement shall survive any Closing Date. Except the exhibits hereto or the documents and papers delivered by Sellers to Buyers in connection with the Agreement herewith, there are no other agreements, representations, warranties, or covenants by or among the parties hereto with respect to the subject matter hereof.

8.    **Buyer's Evaluation**

Buyers acknowledge that they are experienced and knowledgeable investors in businesses such as The Business, and are aware of the risks.

9.    **Cooperation**

Both Sellers and Buyers agree to cooperate fully with each other and to execute such further instruments, documents and agreements and to give such further written assurances, as may be reasonably requested by the parties, to better evidence and consummate the transactions described herein and contemplated hereby, and to carry into effect the intents and purposes of this Agreement.

10.    **Bankruptcy**

There are no bankruptcy, reorganization or arrangement proceedings pending, being contemplated by or to such Buyers' knowledge threatened against such Buyers or any affiliate of such Buyers.

11.    **Confidentiality**

Both Sellers and Buyers shall not divulge, communicate, or use to the detriment of the other or for the benefit of any other person or persons, or misuse in any way, any of Sellers' confidential information discovered by or disclosed to Sellers or Buyers as a result of the delivery, execution or performance of this Agreement.

BG Initials
RR Initials

SA Initials
TM Initials

10

EXHIBIT 2
29

### 12. No Investment Company

Buyers are not (a) an investment company or a company controlled by an investment company within the meaning of the Investment Company Act of 1940, as amended, or (b) subject in any respect to the provisions of that Act.

**C.    Transactions Prior to Closing(s)**

### 1. Conduct of Sellers until Initial Closing

Except as Buyers may otherwise consent in writing prior to the Initial Closing Date, Sellers will not enter into any transaction, take any action, or fail to take any action which would result in or could reasonably be expected to result in or cause any of the representations and warranties of Sellers contained in this Agreement to be void, invalid, or false on the Initial Closing Date.

### 2. Conduct of Sellers until Final Closing

Except as Buyers may otherwise consent in writing prior to the Final Closing Date, Sellers will not enter into any transaction, take any action, or fail to take any action which

BG initials 
RR initials

SA initials 
TM initials

11

EXHIBIT 2
30

would result in or could reasonably be expected to result in or cause any of the representations and warranties of Sellers contained in this Agreement to be void, invalid, or false on the Final Closing Date. It is expressly understood that Sellers may take reasonable and necessary actions to protect, maintain, renew or otherwise keep in existence all current licenses and permits necessary to conduct business.

**3.      Resignation of Officers and Employees prior to Initial Closing**

Sellers shall deliver to Buyers prior to the Initial Closing Date such resignations of officers or employees of the business as Buyers shall indicate in writing, and each such resignation to be effective on the Initial Closing Date.

**4.      Designation of New Managing Partner of Business**

> Formatted: Font: Bold

No later than two (2) business days following the Initial Closing Date, Sellers shall deliver to Buyers duly executed forms and documents evidencing the designation of Sabrina Acatrinei as the Managing Member of Lost Sheep LLC, with all legal power and authority thereto. This includes but is not limited to filing an updated Statement of Information with the Secretary of State of California and the Secretary of State of Texas.

BG Initials
RR Initials

SA Initials
TM Initials

12

EXHIBIT 2
31

5.    **Business Lease**

Formatted: Font: Bold

Sellers acknowledge that the property lease currently operative on the Studio City Facility is non-assignable. Sellers shall cooperate fully with Buyers and the Studio City Facility's Landlord to satisfy all of the Sellers' remaining responsibilities with respect to ending the existing lease (including but not limited to paying all outstanding rent averages, rent, maintenance and other expenses relating to the current lease), and to assist Buyers in securing a new, separate lease with the Landlord for the Studio City Facility.

6.    **Management Services Agreement**

Formatted: Font: Bold

Concurrently with the execution of this Agreement, Sellers and Buyers shall each execute on behalf of their respective companies – Lost Sheep LLC and The Giving Tree LLC – the Management Services Agreement attached and incorporated hereto as Exhibit B ("MSA"). Pursuant to the MSA, in the interim period between the Initial Closing Date and the Final Closing Date, Buyers and Buyers' company, The Giving Tree, shall independently operate the Business as managers using the licenses, permits and accreditation of Lost Sheep LLC. As compensation for performing all tasks and duties involved in managing and operating all aspects of the Business, Buyers and The Giving Tree LLC shall collect any and all income generated from operating the Studio City Facility, including but not limited to all accounts receivable collected following the execution of this Agreement and the MSA irrespective of the original date of service.

7.    **"Manager" Bank Account**

Formatted: Font: Bold

No later than two (2) business days following the Initial Closing Date, Sellers shall deliver to Buyers duly executed forms and documents evidencing the establishment of a "Manager" bank account for the Business with a financial institution mutually acceptable to both parties, designating The Giving Tree LLC or another individual designated by Buyers as the account "Manager" and granting said "Manager" and its representatives sole access to such account. Sellers shall allow Buyers to be the account "Managers," with exclusive signing authority and control of the account until such time that the Buyers' bank account is "credentialed" with insurance companies for the purposes of electronic funds transfers.

8.    **Licenses, Permits and Accreditations**

(a) Following the Initial Closing Date, the Business shall continue to operate at the Studio City Facility using the licenses, permits and accreditation of Lost Sheep LLC until Buyers and Buyers' company The Giving Tree LLC secure licensure and accreditation to operate the Studio City Facility on their own. Buyers are expressly

BG initials _____    SA initials _____
RR initials _____    TM initials _____

13

EXHIBIT 2
32

relying on the use of Sellers' license and accreditation for the operation of the Business, and Sellers shall maintain said licensure status and accreditation until at least the Final Closing Date.

(b) Sellers shall assist Buyers and The Giving Tree LLC in the process of changing, modifying, or amending the current licenses, permits, and accreditation in order to maintaining the Business's current licensure and accreditation, as well as to assist Buyers and The Giving Tree in securing independent licensure and accreditation. Specifically, Sellers shall assist Buyers and The Giving Tree to apply and obtain licenses and permits to independently operate as a Drug and Alcohol Rehabilitation SUD facility through the DHCS-CA, as well as to apply and obtain separate accreditation from the Joint Commission. Both parties acknowledge and agree that the Final Closing Date shall take place only after Buyers and The Giving Tree secure their independent licensure and accreditation.

96.    **Resignation of Officers and Employees upon Final Closing**

Sellers shall deliver to Buyers after the Final Closing Date the resignations of Sellers from the Business and all interest therein to be effective on the Final Closing Date.

10₇.    **Documents**

Sellers shall deliver to Buyers at Initial Closing such documents which are in Buyers' sole discretion and necessary to fully satisfy the objectives of this Agreement in content and form.

D.    **Non-Solicitation**

Sellers acknowledge that they possess and will possess confidential information about the employees of the Business, including but not limited to their education, experience, skills, abilities, compensation and benefits, and inter-personal relationships with insurance companies and the customers of the Business. Sellers acknowledge that the information they possess and will possess about these employees is not generally known, is of substantial value to the Business in developing its operations, and in securing and retaining customers, and has been and will be acquired by Sellers because of their business positions with the Business. Sellers further agree that any attempt to encourage or induce employees, directors, agents, or contractors to leave their jobs with the Business would be harmful and damaging to the Business and the Buyers. Sellers thus agree that during the term of this Agreement and for a period of two years after the Initial Closing Date of this Agreement, Sellers will not in any way directly or indirectly:

BG initials
RR initials

SA initials
TM initials

14

EXHIBIT 2
33

(a) induce or attempt to induce any employee, director, agent, contractor or other service provider of the Business to quit employment or retainer with the Business or the Buyers;

(b) otherwise interfere with or disrupt Buyers' relationship with their employees, directors, agents, contractors or other service providers;

(c) discuss employment opportunities or provide information about competitive employment to any of the Business's employees, directors, agents, contractors or other service providers; or

(d) solicit, entice, or hire away any employee, director, agent, contractor or other service provider of the Business.

**E.    General Provisions**

**1.    Waivers**

No action taken pursuant to this Agreement including any investigation by or on behalf of any party shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein or therein and in any documents delivered in connection herewith or therewith. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

**2.    No Third-Party Beneficiaries**

Except as otherwise provided, nothing in this Agreement shall provide any benefit to any third party or entitle any third party to any claim, cause of action, remedy, or right of any kind, it being the intent of the Parties that this Agreement shall not be construed as a third-party beneficiary contract.

**3.    Notices**

All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered or mailed, first class mail, postage prepaid to Seller, Buyer, or to such other address as such party shall have specified by notice in writing to the other party.

BG Initials 
RR Initials

SA Initials
TM Initials

15

EXHIBIT 2
34

**4.    Sections and Other Headings**

The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretations of this Agreement.

**5.    Governing Law; Venue**

Both parties agree that any conflicts, disagreements, questions or other matters arising under this Agreement, whether of validity, interpretation, performance or otherwise, will be governed by and construed in accordance with the laws of the State of Texas Texas, without regard to any other state's choice of law rules. All actions and proceedings arising out of or relating directly or indirectly to this Agreement will be filed exclusively in any state court or federal court located in, or related to, the city or county of Houston, Harris County, Texas. The parties both expressly consent to the jurisdiction of these courts and agree that venue is proper in these courts.

**6.    Conditions Precedent**

If the obligations and responsibility of either party are not fulfilled by the appropriate dates thereof, then this Agreement shall be deemed null and void and there will be no further liability as between the parties..

**7.    Time is of the Essence**

Time and timely performance are of the essence in this Agreement and of the covenants and provisions hereunder.

**8.    Successors and Assigns**

This Agreement may not be assigned without the prior written consent of the parties hereto. Rights and obligations created by this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns. Whenever used, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

**9.    Contractual Procedures**

Unless specifically disallowed by law, service of process in any litigation that arise hereunder may be obtained through certified mail, return receipt requested; the parties hereto waiving any and all rights they may have to object to the method by which service was perfected.

BG Initials _____    SA Initials _____
RR Initials _____    TM Initials _____

16

EXHIBIT 2
35

10.    **Extraordinary Remedies**

To the extent cognizable at law, in the event of breach the parties hereto may obtain injunctive relief in addition to any and all other remedies available thereto regardless of whether the injured party can demonstrate that no adequate remedy exists at law.

11.    **Entire Agreement**

This –Agreement and the Management Services Agreement, incorporated hereto as Exhibit B, contains the entire understanding of the parties, and there are no other promises or conditions in any other agreement whether oral or written concerning the subject matter of this Agreement. This Agreement and its attachments supersedes any prior written or oral agreements between the parties.

12.    **Severability**

If any provision of this Agreement will be held to be invalid or unenforceable for any reason, the remaining provisions will continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision will be deemed to be written, construed, and enforced as so limited.

13.    **Amendments**

This Agreement may be modified or amended in writing, if the writing is signed by the party obligated under the amendment.

14.    **Initials and Exhibits**

This Agreement shall not be valid and enforceable unless it is properly executed by Buyers and Sellers and their initials affixed to each page made a part hereof.

15.    **Counterparts**

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[Remainder of Page Left Intentionally Blank]

BG initials _____
RR initials _____

SA initials _____
TM initials _____

17

EXHIBIT 2
36

### 166. Separate Counsel

The Parties represents and warrant that each has retained independent legal counsel with respect to the legal effects of this Agreement. No party has provided legal advice to another Party in this regard. The Parties acknowledge and agree that each is entering into this Agreement of his/her own free will, not the product of coercion or duress, economic or otherwise.

Formatted: Centered

Formatted: Font: 11 pt, Italic

_____    _____    _____    _____
Brad Grady (Seller)    Date    Ross Remien (Seller)    Date

Authorized signature

Sworn and subscribed before me by Brad Grady on    Sworn and subscribed before me by Ross Remien on
10 , 31 , 2018.    Oct 31 , 2018.

_____    _____
Notary Public in and for The State of Texas    Notary Public in and for The State of California
Attorney
Seal

My commission expires: 00786853    My commission expires: _____

_____    _____    _____    _____
Sabrina Acatrinei (Buyer)    Date    Tibor Mezei (Buyer)    Date

Sworn and subscribed before me by Sabrina Acatrinei on    Sworn and subscribed before me by Tibor Mezei on
October 31 , 2018.    Oct. 31 , 2018.

_____    _____
Notary Public in and for The State of California    Notary Public in and for The State of California

My commission expires: _____    My commission expires: _____

BG initials ____    SA initials ____
RR initials ____    TM initials ____

18

MICHAEL J HEGEDUS
Notary Public - California
Los Angeles County
Commission # 2162869
My Comm. Expires Aug 18, 2020

EXHIBIT 2
37



BG initials
RR initials

19



SA Initials
TM Initials

EXHIBIT 2

38

**Exhibit "A"**
**Documents for Review**

For all documents named below the Sellers shall provide full and complete records covering the
past 2 years.

Leasehold Agreement(s)

Income Tax Return(s)

Operating Agreement(s)

By-laws

Joint Commission Accreditation Certificate

License

BG Initials 
RR Initials

SA Initials 
TM Initials

20

EXHIBIT 2
39

# Exhibit 3

DocuSign Envelope ID: 81E0404A-E8BD-43DA-8569-EFC15D04B2F6

## LLC INTEREST PURCHASE AGREEMENT

This LLC Interest Purchase Agreement ("Agreement"), July 29 , 2019, is entered by and among F2 MANAGEMENT ("Buyer"), on the first part, and SABRINA ACATRINEI and TIBOR MEZEI ("Sellers"), on the second part, is made with reference to the following facts:

### RECITALS

A.      Sellers own ONE HUNDRED PERCENT (100%) of the issued and outstanding LLC interests in THE GIVING TREE, LLC ("THE GIVING TREE").

B.      Sellers desires to sell and Buyer agrees to purchase one hundred percent (100%) of Sellers' LLC interest in THE GIVING TREE, pursuant to the terms and conditions set forth below.

C.      Buyer understands that the purchase price is for the business only and understands the real property (house) must continue to be rented from owner of record.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and in reliance upon the representations and warranties contained herein, the parties mutually covenant and agree as follows:

1.      <u>PURCHASE AND SALE OF LLC INTEREST</u>

1.1      <u>Purchase Price</u>.  Subject to the terms and conditions of this Agreement, and effective as of the close of business on the Closing Date, Sellers shall sell to Buyer, and Buyer shall purchase from Sellers, at the purchase price set forth below (the "Purchase Price"), all of Sellers' LLC interests in THE GIVING TREE.

1.2      <u>Payment of Purchase Price</u>. The Purchase Price shall be One Hundred and Fifty Thousand Dollars ($150,000.00). Payment shall be made via electronic (wire) transfer to Sellers, as follows:

(a)      Payment of Eighty Thousand Dollars ($80,000), on or before the complete execution of this Agreement.

(b)      The balance of Seventy Thousand Dollars ($70,000) shall be payable on or before March 1, 2020 with the following payment schedule. (See exhibit A.)

(c)      The Parties agree that the Parties will not be bound by the terms of the agreement, and Sellers' interest will not transfer to Buyer until all payments described in Paragraph 1.2 (a)(b) and (c) are completed and the entire purchase price of $150,000.00 is received.

(d)      If Buyer fails to make any minimum payments buyers shall have a cure period of fourteen (14) calendar days following the missed due date without incurring any penalty. If applicable minimum payment has not been made during the Cure Period, a penalty equal to 10% of the min payment shall accrue on the first of each calendar month. If payment becomes more than 90 days overdue, sellers have the right to by written notice to buyers declare that the entire amount of the final closing amount then outstanding plus accrued and unpaid penalties to the date of acceleration

EXHIBIT 3
41

shall become immediately due and payable. IF Acceleration payment is triggered, Buyers failure to make such payment will cancel the right of ownership and cause business to revert to sellers.

2.    CLOSING DATE AND MATTERS

The closing of the transactions contemplated by this Agreement (the "Closing") shall take place concurrently with the execution of this Agreement. At the Closing, Sellers shall deliver to Buyer the following documents:

(a) Sellers will relinquish ownership interest in the intellectual (or other) property rights (the house and fixtures). Subject to terms in Section 1.2 A-D

(b) Sellers shall also deliver to Buyer all property, of whatever nature, relating to THE GIVING TREE in their possession. This shall include, but is not limited to, files, documents, materials, records, reports, computers, file keys, computer access codes, disks, door and file keys, customer lists, vendor lists, intellectual properties, websites, business relationships, and other physical or personal property which sellers received, prepared or helped prepare in connection with THE GIVING TREE. Subject to terms in Section 1.2 A-D

(c) Sellers are retaining ownership of aging report accounts receivables. Previously billed charges are retained by the seller. Buyer agrees this purchase does not include rights to the aging report/account receivables prior to July 29th 2019.

3.    REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers represent and warrant to Buyer as follows:

3.1    Authorization. Sellers have full authority and right to enter into and execute this Agreement. This Agreement constitutes a valid and binding agreement of Sellers and is enforceable in accordance with its terms.

3.2    LLC Ownership Interest-THE GIVING TREE, LLC. Sellers are owners of one hundred percent (100%) of the issued ownership interests in THE GIVING TREE and Sellers' ownership interest in THE GIVING TREE is free and clear of any liens, claims, pledges or encumbrances (including, without limitation, spousal claims). There are no rights, agreements, arrangements or understandings involving the Sellers, or otherwise restricting or affecting the acquisition, disposition or voting of any of Sellers' LLC interest in THE GIVING TREE.

3.3    Options, Rights and Agreements. Sellers do not have any commitments to sell any shares of LLC interests in THE GIVING TREE, or any securities or obligations convertible into or exchangeable for or giving any person any right to subscribe for or acquire from them, and no options, warrants, rights or other securities or obligations evidencing such rights are outstanding. Sellers do not have any outstanding agreement, undertaking, commitment or obligation to repurchase or redeem any LLC ownership interest in THE GIVING TREE.

4.    REPRESENTATIONS AND WARRANTIES TO SELLERS

EXHIBIT 3
42

Buyer represents and warrants to the Sellers as follows:

4.1    Authority of Buyer. Buyer has all necessary power and authority to make, execute, deliver and consummate this Agreement and the transactions contemplated hereby, and has taken all necessary actions required to be taken to authorize Buyer to execute and deliver this Agreement and to perform all of its obligations, undertakings and agreements to be observed and performed hereunder. This Agreement has been duly executed and delivered by the Buyer and is a valid and binding agreement for the Buyer.

4.2    Litigation and Claims. To the knowledge of Buyer, there are no pending, outstanding or threatened claims, legal, administrative or other proceedings, suits, investigations, complaints, notices of violation or similar process, judgments, injunctions, orders, decrees, directives or restrictions against, relating to or affecting: (i) THE GIVING TREE or any of their assets or business; or (ii) the Buyer, which if finally determined adversely to them, might, individually or in the aggregate, have a material adverse effect on the condition (financial or otherwise), operations, business or prospects of THE GIVING TREE. There are no such claims, proceedings, suits, investigations or restrictions pending or, to the knowledge of the Buyer, threatened challenging the validity or propriety of the transactions contemplated by this Agreement.

THE GIVING TREE is not subject to any judgment, order, or decree or any governmental regulation made expressly applicable to THE GIVING TREE which might materially adversely affect the condition (financial or otherwise), operations, business or prospects of THE GIVING TREE, or its ability to acquire any property or conduct business in any area, or which would interfere with the transactions contemplated by this Agreement.

4.3    Full Disclosure. No representation, warranty or covenant made by Buyer to Sellers in this Agreement, nor any document, certificate or exhibit given or delivered or to be given or delivered by the Buyer to the Sellers pursuant to this Agreement, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained in this Agreement or the matters disclosed in such document, certificate or exhibit, in light of the circumstances under which such statements or disclosures were made, not untrue or materially misleading.

4.4    Ownership Structure. Post-Closing, THE GIVING TREE, LLC shall be owned one hundred (100%) by F2 MANAGEMENT.

4.5    Property Lease. Property Leased to THE GIVING TREE (4198 Sunswept Dr., Studio City, California 91604) will remain leased to THE GIVING TREE for the remainder of the lease as the success of THE GIVING TREE depends on the licensed property to operate. Buyer agrees to follow all local, state, and regulatory rules and regulations associated with the business.  Buyer assumes all responsibility regarding the lease details and hereby releases Sellers from all liability regarding the property lease upon execution of this agreement.

5.    INDEMNIFICATION BY BUYER

(a)    Buyer herewith agree to indemnify and hold Sellers and their successors and assigns harmless against:

EXHIBIT 3

43

(i)    Any and all claims, liabilities, and obligations of any kind or nature, contingent or otherwise, arising from Buyer's operation of the business of THE GIVING TREE, including, but not limited to, any and all claims, liabilities, and obligations arising or required to be performed prior to and subsequent to the Closing Date under any lease, contract, or agreement assumed by Buyer hereunder. In this regard, Buyer is solely responsible for any expense or liability related to the operations of THE GIVING TREE, regardless of time; and

(ii)    Any and all damage occasioned by, arising out of or resulting from any misrepresentation, breach of warranty, or covenant, or default or nonfulfillment of any agreement or obligation assumed or required to be assumed by Buyer under this Agreement;

(b)    Sellers shall notify the Buyer in writing within thirty (30) days of the occurrence of any event, or of their discovery of any facts, which in the opinion of their counsel entitles or may entitle them to indemnification under this paragraph 5, provided, however, that failure to give such notice within such thirty (30) day period shall not affect the liability of Buyer under this paragraph 5 unless the failure to give such notice within such time period adversely affects to a material degree Buyer's ability to defend themselves against a claim of Sellers or to cure the default giving rise to the claim for indemnification on account thereof. With respect to threatened or asserted claims of third parties, Buyer shall promptly defend such claim by counsel of its own choosing.

(c)    If Buyer, within a reasonable time after notice of claim, fails to defend Sellers, Sellers shall be entitled to undertake the defense, compromise or settlement of such claim at the expense of and for the account and risk of Buyer, subject to the right of the Buyer to assume the defense of such claim at any time prior to the settlement, compromise or final determination thereof. Anything in this subparagraph to the contrary notwithstanding:

(i)    if there is a reasonable probability that a claim may materially and adversely affect Sellers, Sellers will have the right, at his own cost and expense, to defend, compromise or settle such claim;

(ii)    if the fact giving rise to indemnification hereunder shall involve a possible claim by Buyer against a third party, Sellers shall have the right, at their own cost and expense, to undertake the prosecution, compromise and settlement of such claim; and

(iii)    Buyer will not, without Sellers' written consent, settle or compromise any claim or consent to any entry of judgment which does not include as an unconditional term thereof the giving by the claimant or the plaintiff to Sellers of a release from all liability in respect to such claim.

6.    ALL REASONABLE EFFORTS

Subject to the terms and conditions herein provided, each of the parties hereto agrees to use all reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, property, and advisable under applicable laws and regulations to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement. If at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, including, without limitation, the execution of additional instruments, the parties to this

EXHIBIT 3
44

Agreement shall take all such necessary action.

      7.    Breach.    Recognizing that a breach by Sellers of the covenants and conditions contained in this Covenant would cause Buyer irreparable injury and that damages at law for such a breach would be difficult to ascertain, Sellers expressly acknowledges and agrees that any such breach would justify equitable relief in the nature of a restraining order or a temporary or permanent injunction against Sellers prohibiting such breach, and further agrees that Buyer shall be entitled, if they so elect, to institute and prosecute proceedings in any court of competent jurisdiction, either in law or in equity, to enforce the specific performance of the Covenant against Sellers, to enjoin Sellers from activities in violation of this Covenant and to recover Buyer's reasonable attorneys' fees and costs incurred thereby, whether in an action at law or in equity.

      8.    CONFIDENTIALITY

      The Parties agree to use their best efforts to keep confidential any and all information furnished to either of them by a party in the course of the business, except such information as may be available to the public or to the other party from another source not under any obligation of confidentiality. At no time during execution of this Agreement will Sellers disclose any Confidential Information gained during or as a result of the relationship with THE GIVING TREE. Confidential Information means any information that is, or should reasonably be understood to be, confidential or proprietary to THE GIVING TREE. Confidential Information includes but is not limited to all information, whether in written, oral, electronic, magnetic, photographic or any other form, that relates to matters not generally known to the public and/or not publicly disclosed by THE GIVING TREE including: past, present and future businesses, plans, services, products, concepts, intellectual property, inventions, know-how, sources, costs, pricing, technologies, customers, vendors, other business relationships, business ideas and methods, distribution methods, inventories, manufacturing processes, computer programs and systems, employees, hiring practices, operations, marketing strategies and other technical, business and financial information.

      The Parties further agree that, except as may be required by law, neither Party, nor affiliate or agent, will disclose to any individual or entity the terms of this Agreement. In the event that such disclosure is made, the offending party shall be liable for breach of this Agreement.

      9.    GENERAL PROVISIONS

      9.1    Representations, Warranties and Covenants. In the absence of fraud or intentional misrepresentations, the representations and warranties made by the Sellers under the Agreement shall survive the Closing until the third anniversary of the Closing Date.

      9.2    Finders, Consultants and Brokers. The Parties hereto hereby represent and warrant to one another that there has been no finder, broker or consultant involved in the negotiations leading up to the execution of this Agreement.

      9.3    Reliance Upon Representations and Warranties. The Parties mutually agree that, notwithstanding any right of each party to fully investigate the affairs of the others hereunder, and notwithstanding any knowledge of facts determined or determinable by the investigating party pursuant to such investigation or right of investigation, each party has the right to fully rely upon the representations and warranties of the other contained in this Agreement and on the accuracy of any

EXHIBIT 3
45

DocuSign Envelope ID: 81E0404A-E8BD-43DA-8569-EFC15D04B2F6

document, certificate or exhibit given or delivered by any party pursuant to this Agreement. Further, knowledge by an agent of any party of any facts so determined or determinable which are not otherwise disclosed in this Agreement or in any document, exhibit or certificate delivered by any party pursuant to this Agreement shall not constitute a defense by any party for any claim for loss or damage by any other party for any misrepresentation, breach of warranty or breach of covenant made by it in this Agreement or in any such document, certificate or exhibit.

9.4    Execution in Counterparts. For the convenience of the parties, this Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

9.5    Governing Law. This Agreement shall be construed and interpreted, and the rights and liabilities of the parties hereto determined, in accordance with the internal laws of the State of California.

9.6    Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of each of the other parties, except that Buyer may assign all of their rights, interests and obligations hereunder to a directly or indirectly wholly-owned subsidiary of Buyer, provided that such assignment shall not relieve Buyer of their liabilities and obligations hereunder.

9.7    Amendment and Modification. This Agreement may be amended, modified and supplemented only by a writing signed by all the parties hereto.

9.8    Headings. The headings of the Sections of this Agreement are inserted for convenience only and shall not constitute a part hereof or affect the meaning or interpretation hereof.

9.9    Severability. The parties agree that if any term or provision of this Agreement contravenes or is invalid under any federal, state or local law, court decision, rule, ordinance or regulation, the Agreement shall be construed as if it did not contain the offending term or provision (but only to the extent that such term or provision cannot be appropriately reformed or modified), and the remaining provisions of this Agreement shall not be affected thereby.

9.10    Entire Agreement. This Agreement, including the exhibits hereto and the agreements expressly provided for herein, embodies the entire agreement among the parties hereto with respect to the transactions contemplated hereby, and there have been and are no agreements, representations or warranties among the parties other than those expressly set forth or provided for herein.

9.11    Attorneys' Fees. In any litigation, including Arbitration, relating to this Agreement, including any litigation with respect to any instrument, document or agreement made under or in connection with this Agreement, the prevailing party shall be entitled to recover its costs and reasonable attorneys' fees.

9.12    Exhibits. All exhibits attached to this Agreement shall be deemed part of this Agreement and incorporated herein, where applicable, as if fully set forth therein.

EXHIBIT 3
46

DocuSign Envelope ID: 81E0404A-E8BD-43DA-8569-EFC15D04B2F6

9.13    Warranty of Signatories.  Each of the persons signing this Agreement on behalf of an entity warrants and represents that he has the right, power, legal capacity and authority to execute this Agreement on behalf of such entity, without the concurrence or approval of any other person, any entity or any Court, and to thereby bind such entity to this Agreement.

9.14    Review of Agreement by Counsel; Familiarity with Contents and Effect. Sellers and Buyer expressly declare that each of them has been supplied with and has read a copy of this Agreement. The Parties further represent that they have each consulted with their respective attorneys regarding the meaning of the terms and conditions contained herein and fully understand the contents and effect of this Agreement. Sellers and Buyer approve and accept the terms and provisions of this Agreement and agree to be bound by it.

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement and caused their signature, where applicable, to be affixed the day and year first above written.

"SELLERS"

By: _____  7/29/2019
TIBOR MEZEI

By: _____  7/29/2019
SABRINA ACATRINEI

"BUYER"

By: _____  7/29/2019

AARON BARSALOU, Principal
F2 MANAGEMENT

EXHIBIT 3
47

DocuSign Envelope ID: 81E0404A-E8BD-43DA-8569-EFC15D04B2F6

## EXHIBIT A

### ASSIGNMENT OF INTEREST DISBURSEMENT SCHEDULE – THE GIVING TREE LLC.

1.  **On full execution of this agreement dated July 29, 2019  $80,000.00**      _____

2.  **Sept 1st, 2019 a payment of $10,000.00**      _____

3.  **Oct 1st, 2019 a payment of $10,000.00**      _____

4.  **Nov 1st, 2019 a payment of $10,000.00**      _____

5.  **Dec 1st, 2019 a payment of $10,000.00**      _____

6.  **Jan 1st, 2020 a payment of $10,000.00**      _____

7.  **Feb 1st, 2020 a payment of $10,000.00**      _____

8.  **Mar 1st, 2020 a payment of $10,000.00**      _____

EXHIBIT 3
48